Shelly L. ADAMS, etc., et al., Plaintiffs,

v.

GENERAL DYNAMICS CORPORATION, Defendant.

GENERAL DYNAMICS CORPORATION, Third-Party Plaintiff,

v.

INTERNATIONAL CONTROLS CORP., and Datron Systems, Inc., Third-Party Defendants.

Nos. C–72–77–PMH to C–72–89–PMH.

United States District Court, N. D. California.

Dec. 15, 1975.

See also, 385 F.Supp. 890.

Walkup, Downing & Sterns, by Gerald C. Sterns, Paul V. Melodia, and Thomas G. Smith, San Francisco, Cal., for plaintiffs.

Cooper, White & Cooper, by R. Barry Churton and Neil L. Shapiro, San Francisco, Cal., for defendant and third-party plaintiff, General Dynamics Corp.

Sedgwick, Detert, Moran & Arnold, by Robert C. Colwell, San Francisco, Cal., for third-party defendants Intern. Controls Corp. and Datron Systems, Inc.

## MEMORANDUM FOR SUMMARY JUDGMENT

PEIRSON M. HALL, District Judge.

On May 4, 1970, a United States military aircraft crashed, killing all but one of the 13 military personnel aboard. Thirteen suits were filed in the California state courts in 1971. The suits were based primarily on strict products liability and/or negligence in the manufacture of the pilot's D.V. window frame. All the suits were timely and properly removed to the United States District Court for the Northern District of California in January, 1972. On May 16, 1972, they were duly and regularly assigned to the undersigned judge, sitting by general assignment in this court under 28 U.S.C. § 294(c).

Upon such assignment, discovery was immediately commenced. It proceeded as rapidly and as comprehensively as possible under the circumstances until meaningful settlement negotiations resulted in settlement and dismissal by the original plaintiffs of all the wrongful death suits, leaving pending only the case filed by Capt. Burk against General Dynamics, No. 72–78, for personal injuries. He was the sole survivor of the crash and claims permanent injury and severe 80 degree body burns.

On July 13, 1973, the Court made an order upon a complaint previously filed, bringing in as third-party defendants International Controls Corp. and Datron Systems, Inc., in which complaint General Dynamics Corporation sought indemnity or contribution from the third-party defendants for the monies it had paid out, and were liable to pay out, on account of said accident, as successors in interest of R. H. Osbrink, Inc., a California corporation, which manufactured the aluminum frame for the D.V. cockpit window in 1953–54 and sold it to General Dynamics, which in turn sold the airplane in which it was installed to the United States.

The aluminum frame is alleged to have been at fault in its construction so as to have broken in flight maneuvers, shattering the glass in the pilot's compartment and causing the plane to crash and kill all the occupants except Captain Burk.

Osbrink was a family-held corporation. In 1964 it sold all of its assets to Electronic Specialty Co. by a written agreement dated March 3, 1964, which called for a closing date of March 31, 1964. The purchase price was to be not less than 35,667 nor more than 39,801 shares of the common stock of Electronic Specialty Co., which was capitalized at three million shares, of which, at that time, 1,541,029 shares were outstanding, before giving effect to the stock issued to Osbrink for the purchase of its assets. An additional consideration was to be that Osbrink would liquidate its business and dissolve the corporation and distribute the Electronic Specialty stock to the shareholders of Osbrink pro rata by March 31, 1964. All of this was accomplished and is not disputed here.

The basis for General Dynamics' complaint for contribution and indemnity against the defendants, International Controls, et al., is: That Osbrink, having negligently or otherwise manufactured a defective product, became liable for put-

ting it into commerce and any injury that might result from such defect; that the sale of Osbrink's assets carried with it the assumption of this then unknown and contingent liability by Electronic Specialty Co.; and that Electronic Specialty merged with International Controls and Datron[1] by a written agreement dated April 22, 1969, and by such merger assumed Osbrink's original contingent liability. It is conceded that Electronic Specialty and International Controls *merged* and that under such merger International Controls assumed whatever liability Electronic Specialty had.

The key question is whether or not Electronic Specialty assumed the products liability, or any liability. for the manufacture, negligent or otherwise, by Osbrink of the aluminum frame of the D.V. window. This requires an examination of the written agreement between Osbrink and Electronic Specialty.

█ The latest expression of the general rule, and its exceptions, applicable to the transaction is cited in *Ortiz v. South Bend Lathe,* 46 Cal.App.3d 842 at 846, 120 Cal.Rptr. 556 at 558, hearing denied by California Supreme Court, May 28, 1975:

> "The general rule is where one corporation sells or transfers all of its assets to another corporation, the latter is not liable for the debts and liabilities of the former unless (1) the purchaser expressly or impliedly agrees to such assumption, (2) the transaction amounts to a consolidation or merger of the two corporations, (3) the purchasing corporation is merely a continuation of the selling corporation, or (4) the transaction is entered into fraudulently to escape liability for debts. (*Pierce v. Riverside Mtg. Securities Co.,* 25 Cal.App.2d 248, 77 P.2d 226; 15 Fletcher W., Cyclopedia of the Law of Private Corporations, § 7122; *Kloberdanz v. Joy Manufacturing*

*Company,* D.C., 288 F.Supp. 817; *Schwartz v. McGraw-Edison Co.,* 14 Cal.App.3d 767, 92 Cal.Rptr. 776.)

█ In the instant case, the parties concede there was no fraud. In the contract of sale, there was specifically and in great detail set forth the debts which Electronic Specialty assumed from Osbrink, and there was a specific exclusion of "any debts, liabilities or obligations of Osbrink of any nature whatsoever other than those expressly assumed by E[lectronic] S[pecialty]."[2] Hence there was no express or implied assumption of the claim. There was, in fact, a disclaimer of assumption of any nondisclosed liabilities.

Here, as in *Ortiz,* the agreement between Osbrink and Electronic Specialty was not so "ambiguous . . . as to require factual resolution of extrinsic evidence in interpreting its meaning." Electronic Specialty was not *merely* a continuation of the Osbrink corporation. Osbrink's receipt of approximately two per cent of the outstanding stock shows that beyond peradventure Osbrink's products were but a small portion of Electronic Specialty Co.'s business. This is further corroborated by the undisputed fact that there was no identity of officers, directors, principal shareholders, or control of Electronic Specialty after the completion of the sale. Nor was there any effort by Osbrink to escape its debts. It not only specified in detail the debts to be assumed by Electronic Specialty, but consented to a nationally known firm of certified public accountants making a complete audit of its books, records, procedures, and information to verify its obligations and assets (Agreement, ¶ 4.01). And, lastly, the consideration was sufficient to pay all the known debts of Osbrink, and they were paid.

Any idea that there was a consolidation or merger is eliminated by: the fact that there was outright purchase of as-

---

**1.** Just when Datron came into the lineup is not clear. There is no issue concerning it, and the conclusions herein reached will apply as well to it as to International Controls.

**2.** ¶ 3.03(a), page 3, of the Plan and Agreement of Reorganization of March 5, 1964, between Osbrink and Electronic Specialty.

sets, accompanied by an assumption by the purchaser of specified debts; the fact that Osbrink was to liquidate (go out of business) and dissolve by the close of escrow on March 31, 1964, and that it did so; the fact that there was an express renunciation of assumption of non-disclosed liability in the contract of sale; and the fact that the transaction was a sale of all of Osbrink's assets to a corporation which issued approximately two per cent of its outstanding stock.

The parties have agreed: that there was nothing fraudulent in the transaction; that none of the elements of a purchase in good faith were lacking; that the transfer was with adequate consideration; and that the known creditors of the transferor were provided for.

Certainly, under the circumstances, the transferee corporation, that is, Electronic Specialty, then doing a business with over a million and a half outstanding shares of stock, was not a mere continuation or reincarnation of Osbrink. When Osbrink liquidated and dissolved, it lost all control over its employees and could neither direct them nor contract for them. Thus any employment of the former employees of Osbrink by Electronic Specialty was a personal thing so far as each employee was concerned and certainly had nothing to do with, and does not bear at all upon, the assumption by Electronic Specialty of a products liability claim which developed when the airplane crashed 16 years after the airplane was sold to General Dynamics.

Some point has been made along the way that Osbrink sold only a "substantial" portion of its assets to Electronic Specialty. But an examination of the agreement shows that the sum of only $10,000 was retained by Osbrink to use whatever portion was necessary in connection with the legal expenses concerned with liquidation and dissolution, and that whatever then remained of the $10,000 was to be paid to Electronic Specialty.

The Court has examined the cases cited and relied upon by the third-party plaintiff. Typical cases are cited, on the third-party plaintiff's behalf, in 49 A.L. R.3d 881 at 895. Several cases are stated to have held that where the consideration for the transfer of all assets was stock of the transferee, leaving no assets in the transferor to pay its creditors, that the transferee corporation was liable. As heretofore indicated, such was not the case in this instance for all the transferor's known creditors were paid. Nevertheless, an examination of each of the cases cited under that heading in 49 A.L.R. made the holding on the basis that two entities, the seller and the buyer, had common or substantially similar ownership or control; whereas, in this case, as before indicated, Osbrink was controlled entirely as a family corporation and it sold for approximately two per cent of the outstanding stock of Electronic Specialty and had no control or any position of control therein. Thus, there was no common or substantially similar ownership or control.

Another case which is typically illustrative of the cases relied on by the third-party plaintiff is *Applestein v. United Board and Carton Corp.,* 60 N.J. Super. 333, 159 A.2d 146 (1960). In that case, Applestein was a dissenting shareholder in which the stock of one corporation was acquired in exchange for a portion of the stock of another corporation. The assets were not transferred. The selling corporation was merely acquired by the acquisition of enough of its stock to control it. Further, and more important, the president of the selling corporation became the president of the buying corporation after he traded his stock for a 40 per cent interest in the buying corporation. Clearly that transaction was a consolidation or a merger; clearly there were elements of good faith lacking in the purchase of the stock; and clearly the transferee corporation was a mere continuation or reincarnation of the old corporation—all of which brought the facts of that case within the exceptions set forth in the *McGraw-Edison* case [*Schwartz v. McGraw-Edison Co.,* 14 Cal. App.3d 767, 92 Cal.Rptr. 776 (1971)] and *Ortiz, supra.*

In a document filed December 5, 1974, the third-party plaintiff made a statement of the genuine issues in opposition to the motion of third-party defendants for a summary judgment of dismissal. These are lettered from A to N, inclusive. I do not think it is necessary for me to categorically answer them here because all of them have been answered, in the negative, to the third-party plaintiff's contentions by the foregoing memorandum.

The third-party defendants' motion for summary judgment is granted, and the Clerk is directed to enter a judgment of dismissal of the third-party complaint of *General Dynamics Corporation v. International Controls Corp. and Datron Systems, Inc.*